# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ALLIANCE LAUNDRY SYSTEMS, LLC,**

    **Plaintiff,**

  v.                                                                    Case No. 07-C-589

**THYSSENKRUPP MATERIALS, NA,**

    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Alliance Laundry Systems, LLC, a Delaware limited liability company whose members are Wisconsin citizens, brings this diversity action against defendant Thyssenkrupp Materials, NA, a Delaware corporation whose principal place of business is Michigan, alleging that defendant, through its distribution division, Ken-Mac Metals, breached a contract to sell stainless steel. Before me now are plaintiff's motion for summary judgment and defendant's motion to compel discovery.

## I. FACTS[1]

Plaintiff manufactures commercial laundry equipment and defendant, through its Ken-Mac Metals division,[2] sells and distributes various metals, including stainless steel. Plaintiff needs stainless steel to manufacture its products, and in May 2005 plaintiff and defendant

---

[1] As I am required to do at the summary judgment stage, I state the facts in the light most favorable to defendant, the non-movant, and draw all reasonable inferences from those facts in defendant's favor. Plaintiff has objected to most of defendant's proposed findings of fact as irrelevant. However, for reasons explained later in this decision, such proposed findings are relevant.

[2] All references to "defendant" refer to defendant's Ken-Mac Metals division.

entered into a written agreement for the supply of stainless steel. The supply agreement commenced on July 1, 2005 and remained in effect until December 31, 2006. The agreement required defendant to supply steel in the specific sizes and gauges necessary for plaintiff's products, and it established a fixed base price for the steel as well as a floating surcharge. Usually, when plaintiff wanted to purchase steel pursuant to the supply agreement, it sent a signed purchase order to defendant. Defendant would then also sign the purchase order and either mail it back to plaintiff or send it with the shipment of purchased metal.

Defendant's credit department approves all orders before defendant fills them, and defendant's repeat customers, including plaintiff, have a line of credit. When defendant enters an order for metal into its computer system, the system will run the order against the customer's line of credit. If the customer's account is in good standing, the computer will automatically print the paperwork necessary to fill the order. Defendant will then assemble and ship the order. But if the customer's account is delinquent, someone in defendant's credit department must approve the order before defendant will fill it. Before the credit department will approve such an order, a credit analyst will speak with the customer to obtain assurances that if defendant ships the metal, the customer will pay for it.

During the term of the supply agreement, defendant periodically sent invoices to plaintiff for the metal plaintiff purchased pursuant to the supply agreement. Such invoices requested payment within thirty days. If plaintiff paid the balance due within thirty days, defendant permitted it to discount the amount owed. The backside of every invoice included the following provision:

> 8. CREDIT TERMS. All orders and shipments shall at all times be subject to the approval of the Seller's Credit Department. The Seller reserves the right to decline to make shipment whenever, for any reason, there is doubt as to

> Buyer's financial responsibility and Seller shall not in such event be liable for breach or nonperformance of this contract in whole or in part.

(Long Decl. ¶ 6 & Ex. A.) Defendant issued dozens of invoices to plaintiff containing this language.

In the early months of the supply agreement, plaintiff paid all invoices in a timely fashion. However, beginning in 2006, plaintiff began accumulating past-due balances. Throughout 2006, defendant sent plaintiff a number of e-mails reminding it of these balances. Defendant encouraged plaintiff to pay the past-due balances so that defendant would not need to place a hold on future shipments to plaintiff. In the meantime, plaintiff decided to obtain its metal from a different supplier and therefore did not renew the supply agreement when it expired at the end of 2006. When 2007 commenced, plaintiff had still not paid invoices for metal purchased under the supply agreement.

When the supply agreement expired at the end of 2006, defendant had a significant amount of steel in its inventory that it had earmarked for plaintiff. Defendant had anticipated selling such steel to plaintiff pursuant to the supply agreement. Because defendant had designed it to plaintiff's specifications, the steel had significantly less value to other potential buyers. When plaintiff terminated the supply agreement, defendant attempted to find buyers for the inventory as quickly as possible to avoid taking a loss. Defendant sold some of the inventory to other buyers, but much of it remained unsold. Thus, on February 22, 2007, defendant, through its employee, Matt Halterman, sent an e-mail to plaintiff's employee, Joel Kuenzli, asking whether plaintiff would submit an offer for the left-over steel. Kuenzli did not immediately respond. On March 5, 2007, another of defendant's employees, Barry Brunner, sent a follow-up e-mail to Kuenzli, inquiring about plaintiff's interest in the steel. Finally, on

March 19, 2007, Brunner sent an e-mail to Kuenzli stating that if plaintiff wanted the excess steel, it needed to submit a proposal by the end of the week. The e-mail added that defendant "need[ed] to move this to you by the end of the month." (Brunner Decl. ¶ 5 & Ex. B.)

On March 20, 2007, Kuenzli responded to Brunner's e-mail by sending an e-mail stating that the "attached Excel spreadsheet lists my offer," referring to a spreadsheet attached to the e-mail electronically. (Brunner Decl. ¶ 6 & Ex. C.) The e-mail added that "[t]he 'Pay Price' column is my offer for the base price of the material and the 'Proposed Surcharge' column is my offer for the surcharge rate/lb per item. We can discuss once you've had a chance to review." (Brunner Decl. ¶ 7 & Ex. C.) About two hours later, Brunner sent a reply e-mail instructing Kuenzli to "Give Matt [Halterman] the purchase order number, so we can start shipping this metal to you." (Brunner Decl. ¶ 8 & Ex. D.) On March 23, 2007, Kuenzli sent an e-mail to Halterman stating:

> The po for the remaining inventory is 334364. It's 81 pages long and I'm in the process of checking and signing it as I write. I will mail the hard copy today to your attention. Please coordinate with Scott on the shipments. I know you're planning to ship all material next week . . No problem . . . But . . . . Some material goes to plant 1 while others go to plant 2. Please work that out with Scott.

(Halterman Decl. Ex. C.) The "Scott" to whom Kuenzli referred was Scott Stettbacher, another employee of plaintiff's with whom Halterman had dealt in the past. After writing the e-mail, Kuenzli signed the purchase order, dated it March 23, 2007 and, as promised, mailed a hard copy to defendant.

In accordance with Kuenzli's instructions relating to shipping, on March 23, 2007, Halterman sent an e-mail to Kuenzli and Stettbacher stating:

-4-

> Joel,
>
> Thank you for the info, I appreciate the heads-up on the ship-to's.
>
> Scott, what is the address for plant 2? I'm assuming that's the new one and plant 1 is the regular one. Do you have a copy of Joel's PO? Can you let me know which items go to which facility? If it's just a case of "Ripon" parts going to plant 1 and "Marianna" parts going to plant 2 that's easy for me to figure out, but if it isn't that cut and dry please let me know by part number.

(Halterman Decl. Ex. D.) The record does not indicate whether Stettbacher ever answered Halterman's questions about where to ship the metal, but on March 26, 2007, Stettbacher sent an e-mail to Halterman providing some additional instructions about how plaintiff wanted to prepare the metal.

At the same time that the parties were negotiating the sale of the left-over metal, defendant's credit department was trying to get plaintiff to pay its overdue invoices. The credit department was communicating with Kuenzli, who, as discussed, was also involved in the attempt to purchase the left-over steel. The credit department sent e-mails and made phone calls to Kuenzli on January 5, January 8, and February 7. In addition, on March 1, 2007, the credit department sent an e-mail to Kuenzli informing him that although plaintiff had paid some of the past-due invoices, it had improperly taken thirty-day discounts on them. Because plaintiff failed to pay within thirty days, it owed the full balance, not the discounted amount. On March 9, 2007, the credit department sent another e-mail to Kuenzli stating that some invoices were 200 days overdue and demanding immediate payment.

After the credit department demanded payment, Kuenzli, Halterman, Brunner and Stettbacher exchanged the e-mails described above concerning the inventory, the last of which was the March 26, 2007 Stettbacher to Halterman e-mail discussing the preparation of certain pieces of metal. Between March 26 and April 11, 2007, the parties apparently had

-5-

no contact. Defendant did not ship the metal, and plaintiff did not contact defendant to demand shipment. Then, on April 11, 2007, defendant's credit department sent an e-mail to Kuenzli, stating that plaintiff had taken more improper discounts and that other invoices remained unpaid. The e-mail included the following words in bold-face type:

> TOTAL AMOUNT THAT NEEDS TO BE PAID TO KEN-MAC IS $77,283.72
> I CANNOT RELEASE ANY MORE MATERIAL TO YOUR COMPANY TILL THIS BALANCE HAS BEEN PAID

(Long Decl. Ex. D.) Plaintiff did not dispute the amount of its past-due balance, nor did it complain about defendant's decision to withhold further shipments until plaintiff paid the past-due balance.

About one week after defendant's credit department informed plaintiff that defendant would not ship more product until plaintiff paid its delinquent account, Halterman spoke with Stettbacher about placing an order for a small number of specific pieces of steel, an order unconnected to the inventory. In discussing the new order, Stettbacher did not mention defendant's failure to ship the inventory. However, Halterman repeated that defendant would not ship any metal to plaintiff until plaintiff paid its delinquent account. Several days later, Stettbacher sent an e-mail to Halterman again ordering several specific pieces of steel. This time, the requested metal included pieces from the inventory. However, before defendant responded, Stettbacher sent another e-mail to Halterman stating that he could obtain the requested metal from another supplier and no longer needed it from defendant. On April 26, 2007, Stettbacher made a third request for a small amount of steel, none of which was part of the inventory. In response, Halterman sent an email to Stettbacher and Kuenzli advising that defendant had sold all of its remaining stock of metal in plaintiff's sizes to other customers. Halterman stated that defendant might be able to order new metal but that the

-6-

turnaround time would be two weeks. During these discussions, plaintiff's agents did not complain about defendant's failure to ship the steel discussed in the March e-mails or object to defendant's decision to withhold further shipments until plaintiff paid its delinquent balance. Previously, when defendant failed to timely ship steel that plaintiff had ordered, plaintiff immediately contacted defendant about the status of the shipment.

In late April, because of plaintiff's failure to pay its outstanding balance, defendant sold the inventory to a steel broker. Although plaintiff offered a higher price, defendant decided that plaintiff was not creditworthy and that therefore it should sell the steel to the broker. In early May, plaintiff, through Kuenzli, made an e-mail proposal to defendant to settle its unpaid debt, and defendant, through Brunner, responded by e-mail that defendant would "accept your payment schedule as stated." (Brunner Dec. Ex. F.) Brunner, who was unaware that defendant had already sold its inventory to a broker, added that "we need an understanding about payment on future shipments to you. We still have a large portion of your metal [referring to the inventory] to ship to you against your latest purchase order you gave me last month. Can you guarantee payment within terms if we ship this metal to you?" (Id.) In response, Kuenzli asked whether future shipments would be subject to the normal payment terms – i.e., if plaintiff paid promptly, it could take a discount. Defendant's credit department responded that defendant would not ship steel until plaintiff paid the overdue balance, but thereafter shipments would be subject to "the existing terms." (Id.) Keunzli did not object to defendant's decision not to ship steel until plaintiff paid its balance but inquired of defendant regarding the status of the inventory.

-7-

By May 15, 2007, after an apparent delay in receiving payment from plaintiff, Brunner learned that defendant had sold the inventory in late April. Brunner e-mailed Kuenzli, informing him of such fact:

> Unfortunately, since there was a long delay in receiving your payments for the open invoices and cleaning up old balances, the inventory was flushed out of our system, and no longer exists. If things would have happened in a more timely manner on your side, I would have been able to do more in keeping this metal for you.

(Brunner Decl. Ex. H.)

## II. DISCUSSION

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating plaintiff's motion, I draw all inferences in a light most favorable to defendant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The parties agree that Wisconsin law governs the substantive issues presented.

The question raised by plaintiff's summary judgment motion can be viewed as one of contract formation (Did the parties form a contract before defendant became insecure about plaintiff's ability to pay and sold the inventory to a broker?) or one of contract interpretation (Assuming a contract, could defendant decline to ship the inventory because of plaintiff's unpaid balance?). As explained below, however I characterize the question, the facts and circumstances surrounding the transaction and the parties' history will determine the answer. These facts and the inferences to be drawn from them are disputed, and I cannot say that a

reasonable jury could not find for defendant. Therefore, I will deny plaintiff's motion for summary judgment. Further, the discovery that defendant seeks is relevant to the issues presented, and I will therefore grant defendant's motion to compel.

I first consider the issue as one of contract formation: did defendant agree to sell the inventory to plaintiff? The Uniform Commercial Code ("UCC") governs this issue because the case involves the sale of goods. Wis. Stat. § 402.102. Article 2 of the UCC provides that "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Wis. Stat. 402.204(1). In the present case, defendant invited plaintiff to submit an offer to purchase steel. On March 20, 2007, plaintiff did so by e-mailing defendant a spreadsheet detailing the items of defendant's inventory that it wished to purchase and the price it would pay. Later that day, defendant e-mailed a response directing plaintiff to supply a purchase order number so that defendant could "start shipping this metal to [plaintiff]." (Friday Decl. Ex. 1 & Ex. B.) A reasonable jury could find that these e-mail communications formed a contract in which defendant promised to ship steel, and plaintiff promised to pay for it.[3] Cf. Webster

---

[3] Although defendant argues that under the Uniform Electronic Transactions Act ("UETA"), Wis. Stat. §§ 137.11-137.26, parties cannot form a contract electronically unless they first agree to do so, defendant is not technically correct. The UCC, not the UETA, provides the substantive law that determines whether parties form contract, and nothing in the UCC prohibits the formation of agreements by electronic means. See UETA Prefatory Note ¶ 3 ("It is important to understand that the purpose of UETA is to remove barriers to electronic commerce by validating and effectuating electronic records and signatures. It is NOT a general contracting statute - the substantive rules of contracts remain unaffected by UETA.") Thus, in the present case, if the jury determines that the parties' e-mails were sufficient to form a contract, the UETA will not prevent its enforcement. However, as explained below, the UCC does require, with certain exceptions, that a contract for the sale of goods priced at $500 or more be evidenced by a writing "signed by the party against whom enforcement is sought." Wis. Stat. § 402.201(1). Whether an e-mail signature constitutes the signature called for by the UCC is a question to which the UETA might be relevant. See

Mfg. Co. v. Montreal River Lumber Co., 159 Wis. 456, 150 N.W. 409 (1915) (holding that letters exchanged between parties could constitute a contract if they evidenced an agreement to be bound).

However, in the parties' previous dealings, when defendant received a purchase order from plaintiff, defendant typically signed and returned it, and in the present case, defendant did not do so. Thus, a reasonable jury could conceivably conclude that the parties understood that until defendant signed and returned plaintiff's purchase order, their e-mail agreement was tentative. Cf. Francis H. Leggett Co. v. W. Salem Canning Co., 155 Wis. 462, 144 N.W. 969, 972 (1914) ("It is equally well settled, however, that letters or telegraphic communications between the parties will not be construed as a contract when it is plain that they were intended only as preliminary negotiations to be followed by a formal contract containing material provisions not contained in or to be inferred from the preliminary letters or communications.").

The "conduct by both parties" after the initial exchange of e-mails is also relevant in determining whether the parties recognized the existence of a contract. Wis. Stat. § 402.204(1). Although plaintiff contends that on March 20, 2007, the parties formed a

---

Wis. Stat. § 137.15(4). But absent a statute of frauds defense, a contract formed by electronic means will be enforceable under the UCC even if for some reason the UETA does not apply to the transaction. As a practical matter, however, if the parties have formed a contract electronically, they will likely be deemed subject to the UETA because "the context and surrounding circumstances, including the parties' conduct" will indicate that they have "agreed to conduct transactions by electronic means." Wis. Stat. § 137.13(2). That is, if the facts show the that the parties reached an agreement electronically, they will likely also show that the parties agreed to conduct the transaction by electronic means. Thus, as the parties prepare this case for trial, they are advised to focus on principles of contract formation under the UCC rather than whether and under what circumstances the UETA allows the formation of contracts by electronic means.

-10-

binding contract calling for the immediate shipment of steel, it did not object when defendant advised it that it would not ship steel until plaintiff paid its outstanding bill. If plaintiff believed that it had entered into a contract that required defendant to ship steel immediately, it is reasonable to infer that it would have demanded shipment by the end of March. Indeed, on past occasions when defendant did not ship metal on time, plaintiff immediately inquired as to the status of the shipment. A jury might (but need not) infer from plaintiff's failure to complain that it did not recognize that the parties had entered into a contract.[4] Thus, whether the parties formed a contract before defendant sold its inventory to someone other than plaintiff is a question of fact to be resolved by the jury after it considers all of the facts and circumstances surrounding the transaction and the parties' prior history.

Because the jury must determine whether the parties entered into a contract, it is premature to determine the contract's terms. Nevertheless, I will discuss several issues regarding terms because they are relevant to defendant's motion to compel. First however, I will address defendant's argument that the statute of frauds prevents enforcement of any purported contract. Under the UCC, a contract for the sale of goods priced at $500 or more is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the party's authorized agent or broker." Wis. Stat. § 402.201. In the present case, the steel at issue was worth more than $500; thus, the UCC required a writing signed by defendant. According to defendant, because the parties conducted the transaction via e-

---

[4] A jury might also conclude that the parties formed a contract that allowed defendant to cancel the transaction if it became insecure about plaintiff's ability to pay. As discussed, whether I characterize the issue as one of contract formation or contract interpretation, the same facts are relevant.

-11-

mail and no party physically signed a writing, no writing "signed by the party against whom enforcement is sought" exists. Id. However, the UETA, see Wis. Stats. §§ 137.11 - 137.26, authorizes parties "to agree" to conduct transactions by e-mail and directs courts determining whether parties have so agreed to consider the "surrounding circumstances, including the parties' conduct." § 137.18(2). If the parties have agreed to do business electronically, an electronic signature will constitute the signature required by the UCC's statute of frauds. Wis. Stat. § 137.15(4).

In the present case, the parties dispute whether or not they intended to conduct the transaction by e-mail and whether or not defendant's e-mails constitute a writing signed by defendant. As noted, whether the e-mails were sufficient to form a contract is a question for the jury to decide by applying UCC rather than UETA principles. Further, I need not concern myself about UETA in resolving the statute of frauds issue because if the jury finds that the e-mails formed a contract, the case will fall within an exception to the statute of frauds provided in Wis. Stat. § 402.201(2), which states:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [Wis. Stat. § 402.201(1)] against such party unless written notice of objection to its contents is given within 10 days after it is received.

Here, both parties are merchants. After they exchanged e-mails agreeing to the sale of steel, plaintiff sent defendant a signed purchase order by both e-mail and regular mail. (Def. Resp. to Pl. Prop Finding of Fact ¶ 12.) If the jury determines that the parties formed a contract electronically, this purchase order will constitute a "writing in confirmation of the contract." Because plaintiff signed it and it describes the steel to be purchased, it is "sufficient against the sender." 1 James J. White & Robert S. Summers, Uniform Commercial Code § 2-5, at

140 (5th ed. 2006) (stating that a confirmatory writing is sufficient against the sender if it is signed by the sender and states a quantity). Further, defendant admits receiving the purchase order and thus had reason to know its contents. Finally, defendant did not object to the contents of the purchase order in writing within ten days. Indeed, defendant admits that such purchase order "sat unsigned and forgotten in a desk drawer at [defendant's] facility in Kenosha." (Def.'s Br. in Opp'n at 2.) Thus, if the jury determines that the parties formed a contract, the statute of frauds will not prevent its enforcement.

As indicated, if the jury concludes that the parties formed a contract, it must also identify the contract's terms. Specifically, it will have to determine whether the contract allowed defendant to sell the inventory to others if it became insecure about plaintiff's ability to pay for it.[5] However, the parties disagree about what evidence the jury may consider in determining such terms. Plaintiff argues that the two e-mails that constitute the purported "offer" and "acceptance" – its proposal to buy steel and defendant's response that plaintiff

---

[5]Defendant suggests that § 2-609 of the UCC, Wis. Stat. § 402.609, applies to this question. To oversimplify, § 2-609 allows a seller to terminate a contract when "reasonable grounds for insecurity arise." However, § 2-609 merely provides another lens through which to look at the same factual question that is also dispositive of the issues of contract formation and the meaning of the contract's terms. As some commentators note:

> Whether a party has reasonable grounds for insecurity depends upon many factors including the seller's exact words or actions, the course of dealing or performance between the particular parties and the nature of the industry. What constitutes reasonable grounds for insecurity in one case might not in another. Consequently, the trier of fact must normally answer whether grounds for insecurity exist.

1 White & Summers, supra, § 6-2, at 376. For the reasons stated in my discussion of contract formation and terms, whether § 2-609 justifies defendant's decision to terminate the purported contract is a question for the jury, the resolution of which will depend on all the facts and circumstances, including the parties' course of dealing.

-13-

should "Give Matt the purchase order number, so we can start shipping this metal to you" – plus the terms in its purchase order establish the terms of the contract and that no other evidence is relevant. Defendant argues that to determine the terms of the purported agreement, the jury must also consider the parties' prior course of dealing, including the terms of defendant's invoices, specifically as they relate to whether defendant could decline to ship steel if it doubted plaintiff's financial responsibility. Plaintiff has thus far declined to produce discovery relating to the parties' history, and defendant has moved to compel it to do so.

As I have explained, the entirety of the parties' business relationship is relevant to determining whether the parties' formed a contract. Under the UCC, the details of such relationship are likewise relevant to determining the meaning of any contract that they may have formed. Wis. Stat. § 402.202 provides:

> **402.202 Final written expression; parol or extrinsic evidence.** Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>     **(1)** By course of dealing or usage of trade (s. 401.205) or by course of performance (s. 402.208);
>     **(2)** By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Had the parties carefully negotiated a detailed written contract set forth in a single document that each party signed, plaintiff's argument that the contract constituted a "final expression of their agreement" and was intended "as a complete and exclusive statement of the terms of the agreement" might have greater force. However, in the present case, no such document exists. Although the parties' e-mails may constitute a final expression of their agreement with

-14-

respect to the items to be purchased and the price, nothing in the e-mails indicates that the parties intended them to constitute a complete and exclusive statement of the agreement's terms. Further, although plaintiff sent a signed purchase order confirming the e-mails and containing additional terms and conditions, the facts surrounding the present transaction plus the parties' prior course of dealing, including the fact that defendant normally sent its own invoices containing its own terms and conditions, suggest that the parties did not intend the purchase order itself to be a complete and exclusive statement of their agreement. Thus, contrary to plaintiff's argument, it would be incorrect to exclude everything except the purported "offer" and "acceptance" e-mails. Instead, because in engaging in the present transaction, the parties more or less continued the business relationship established under the supply agreement, the manner in which they conducted business in the past is relevant to determining the meaning of the words used and the conduct involved in the present transaction. See Wis. Stat. § 401.205(3) (stating that a course of dealing "give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement"). Accordingly, the UCC does not prevent defendant from introducing at trial parol or extrinsic evidence, including evidence concerning course of dealing, regarding the question of whether, if the parties formed a contract, defendant could cancel the transaction if it became insecure about plaintiff's ability to pay. It follows that plaintiff must cooperate in producing such evidence during discovery.

### III. CONCLUSION

For the reasons stated above, no party is entitled to summary judgment, and I will schedule the matter for trial. Defendant's motion to compel is granted. Presumably, in light

of the above discussion, the parties will need to take other additional discovery prior to trial.[6]
Therefore, I will schedule a status conference in my chambers for **August 27, 2008 at 11:00 a.m.** to determine what further proceedings are required before trial.

**THEREFORE, IT IS ORDERED** that plaintiff's motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion to compel is **GRANTED**.

**FINALLY, IT IS ORDERED** that an status conference will be held on **August 27, 2008 at 11:00 a.m.** at the United States Courthouse, 517 East Wisconsin Avenue Room 364, Milwaukee, Wisconsin.

Dated at Milwaukee, Wisconsin, this 5 day of August, 2008.

/s_____
LYNN ADELMAN
District Judge

---

[6]Plaintiff filed its summary judgment motion well before the close of discovery. I stayed all discovery pending resolution of plaintiff's motion, and thus the parties have not completed discovery.